**IT IS ORDERED as set forth below:**

**Date: February 23, 2026**



_____
**Barbara Ellis-Monro
U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

| | |
|---|---|
| IN RE:<br><br>LARRY CARSON HALE, JR.,<br><br>    Debtor. | CASE NO. 25-40120-BEM<br><br>CHAPTER 11 |
| LARRY CARSON HALE, JR,<br><br>    Plaintiff,<br><br>v.<br><br>EIGHTEEN NINETY-SIX, LLC,<br><br>    Defendant. | ADVERSARY PROCEEDING NO.<br>25-4012-BEM |

## O R D E R

Debtor-Plaintiff Larry Carson Hale, Jr. ("Hale") initiated this proceeding by filing a complaint on November 6, 2025 [Doc. 1], and an amended complaint on December 15, 2025 [Doc. 5]. In the amended complaint, Hale asserts claims against Eighteen Ninety-Six, LLC ("ENS") for (1) avoidance of transfers under 11 U.S.C. § 544(b), O.C.G.A. § 18-2-75(a), and Tenn.

Code § 66-3-306(a); (2) alternatively, avoidance of transfers under 11 U.S.C. § 548(a)(1)(B); (3) recovery of avoided transfers under § 550; (4) preservation of avoided transfers under § 551; (5) unjust enrichment; (6) alternatively, quantum meruit; and (7) attorney fees. ENS filed a *Motion to Dismiss or, in the Alternate, Abstain* (the "Motion to Dismiss") [Doc. 7], in which it seeks to dismiss this proceeding as barred by the doctrines of claim splitting and prior pending action and for failure to state a claim for relief. Alternatively, ENS asks the Court to abstain from hearing counts 5, 6, and 7. Hale filed a response to the Motion to Dismiss [Doc. 8], and ENS filed a reply [Doc. 9]. Having considered the factual allegations, the applicable authorities, and the arguments of the parties, the Court will grant the Motion to Dismiss.

**I. Factual Allegations**

Hale filed a Chapter 11 petition on January 30, 2025. [Doc. 5 ¶ 9]. On February 24, 2020, Hale entered into a Land Sale Contract (the "Contract") to purchase 101 S. Court Square, Livingston, Tennessee (the "Property"). [Id. ¶ 10]. The purchase price was listed as $350,000, with a down payment required at the time of closing of $35,000, leaving a balance of $315,000. [Id. ¶ 11]. The balance of the purchase price was to be paid in 180 monthly installments of $2,573.82, with a balloon payment to be paid by February 28, 2025. [Id. ¶ 12]. Upon completion of the payment, title to the Property would vest in Hale. [Id. ¶ 13].

At the time of closing on the Contract, the Property only had two tenants, with a total monthly rental income of $1,550. [Id. ¶ 14]. In practice, Hale made payments under the Contract on a quarterly basis, which were accepted by ENS without any issue or assertion of breach of the Contract. [Id. ¶ 15]. Between 2020 and 2022, Hale paid ENS approximately $123,552 of the total purchase price. [Id. ¶ 16]. In 2023, Hale missed payments for quarters 1 and 2 of the year due to Hale's split from his former business partners. [Id. ¶ 17]. The parties reached an agreement as

2

to the payments due for the first two quarters of 2023, and Hale made the payments for quarters 3 and 4 of 2023. [Id. ¶ 18]. Hale further made all payments due for quarters 1 through 3 of 2024. [Id. ¶ 19].

Due to continued financial struggles that precipitated the filing of the bankruptcy case, Hale and ENS entered into an amendment to the Contract on November 26, 2024 (the "Amendment"). [Id.]. Under the Amendment, the parties agreed to delay the calling of the loan until the expiration of the original Contract with no further interest or principal payments being due. [Id. ¶ 20]. As consideration for the discontinued payments, Hale agreed to increase the balloon payment due on February 28, 2025 to $325,000. [Id. ¶ 21].

The Property is a building that is approximately 129 years old. [Id. ¶ 22]. Upon execution of the Contract, the Property appeared in good condition cosmetically. [Id. ¶ 23]. After closing on the Contract, Hale learned the Property needed a substantial amount of work structurally. [Id. ¶ 24]. Hale performed significant work on the Property so that it could be safely rented and generate income, including: (1) installing concrete pylons to replace temporary metal stands that were rusted and corroded; (2) adding plastic, sand, and fans under the building to control moisture issues; (3) adding a hard-wired camera system and a specialized numbered key system for security; and (4) performing work on the various units in the property to make them usable for tenants. [Id. ¶ 25-26].

On information and belief, Hale estimates he has invested no less than $377,872.26 into the Property, including $159,087.80 from January 30, 2021 to January 30, 2023 and $140,791.06 between January 31, 2023 and January 29, 2025. [Id. ¶ 28, 29]. Because of Hale's improvements to the Property, it now generates more than $5,000 per month in rents and has an

3

estimated value of $779,000. [Id. ¶ 30]. As title owner of the Property, ENS has received a substantial benefit from Hale's work and monetary investments. [Id. ¶ 31].

Hale filed the bankruptcy case because of his continued financial struggles. [Id. ¶ 32]. In Hale's original Schedules filed on February 26, 2025, he listed himself as owning the Property in Schedule A/B and listed ENS as a creditor secured by the Property in Schedule D, as Hale believed title had been transferred into his name. [Id. ¶ 33]. After further review, Hale discovered he was not on the title to the Property. [Id. ¶ 34]. Accordingly, Hale amended the Schedules removing the Property from Schedule A/B, adding Hale's claims against ENS to Schedule A/B, removing ENS from the list of secured creditors, and adding the Contract to Schedule G. [Id. ¶ 35].

On April 18, 2025, ENS filed a proof of claim for $325,000. [Id. ¶ 36]. On May 2, 2025, ENS filed a Motion for Relief from Stay to retake possession of the Property. [Id. ¶ 37]. On May 28, 2025, a consent order was entered that contemplated consummation of the Contract and Amendment on or before August 18, 2025 (the "Consent Order"). [Id. ¶ 38]. Under the Consent Order, Hale was to pay ENS monthly interest payments on the $325,000 balloon payment from the Amendment, amounting to $2,302.08 for the period of March 1, 2025 through the closing date. [Id. ¶ 39]. Hale also was to reimburse ENS for certain expenses, including property insurance and taxes. [Id. ¶ 40]. Hale further agreed to pay ENS's attorney fees accrued up to the closing. [Id. ¶ 41]. Hale was to use the proceeds from the sale of his other real property, including the sale of 103 and 105 East Court Square, Livingston, Tennessee, to pay the balance of the purchase price. [Id. ¶ 42]. The total Hale would be required to pay, not considering interest payments, ENS's attorney fees, and 2024 property taxes, would have been $331,149.03. [Id. ¶ 43]. Since then, Hale made further payments to ENS totaling $12,249.32. [Id. ¶ 44].

4

Hale was unable to consummate the Contract as contemplated by the Consent Order because the proceeds from the sale of 103 and 105 E. Court Square were insufficient to close. [Id. ¶ 45]. When Hale learned the sale would not generate sufficient proceeds to consummate the Contract, he attempted to negotiate an extension with ENS. [Id. ¶ 46]. The closing deadline passed, and ENS did not respond to Hale's request for an extension. [Id. ¶ 47]. Instead, ENS filed an Affidavit Regarding Default under the Consent Order on August 26, 2025, and obtained an order granting relief from the stay to terminate the Contract and to proceed with obtaining possession of the Property and control of the lease agreements for the Property. [Id. ¶ 48]. Hale further presented an offer from a third party to purchase the Property, which would have paid ENS in full and would have generated excess cash to Hale of approximately $20,000. [Id. ¶ 49]. ENS rejected this proposal. [Id. ¶ 50].

One day after Hale submitted the foregoing offer, ENS filed a complaint against Hale on September 30, 2025 in the Chancery Court for Overton County, Tennessee (the "Tennessee AP"). [Id. ¶ 51]. On October 30, 2025, Hale filed a notice of removal to the Bankruptcy Court for the Middle District of Tennessee. [Id. ¶ 52]. On November 7, 2025, Hale filed a Motion to Consolidate this proceeding and the Tennessee AP. [Id. ¶ 53]. On November 20, 2025, Hale filed a Motion to Transfer Venue in the Tennessee AP, which was granted by entry of an agreed order on December 9, 2025. [Id. ¶ 53, 54]. As a result, the Tennessee AP is now pending in this Court.

Hale filed this proceeding to recover money he invested into the Property, which substantially improved its value to ENS's benefit. [Id. ¶ 55]. Hale always expected to receive the benefit of his work improving the Property, and ENS knew of Hale's expectation. [Id. ¶ 56-57].

**II. Analysis**

**A. Claim Splitting and Prior Pending Action**

Counts 5, 6, and 7 of the amended complaint are duplicative of Hale's counterclaims in the Tennessee AP (the "State Law Claims"), and he does not dispute that the same facts and parties are involved in both proceedings. ENS argues that these counts should be dismissed under the doctrines of either claim splitting or prior pending action. Hale argues that both doctrines are intended to promote judicial efficiency and that his motion to consolidate the adversary proceedings, if granted, will serve the same purpose. Hale further argues that circumstances warrant favoring this proceeding over the Tennessee AP because Hale's bankruptcy case is pending in this Court, and ENS has filed a proof of claim and participated in the bankruptcy case.

Under the prior pending action doctrine, "[w]hen a plaintiff files a second complaint alleging the same cause of action as a prior, pending, related action, the second complaint may be dismissed." *Est. of Barnett by & through Barnett v. NaphCare, Inc.*, No. 1:21-CV-2890-TCB, 2021 WL 7541406, at *2 (N.D. Ga. Sept. 2, 2021) (internal quotation marks and citation omitted). "Under the doctrine, the first federal action is generally given priority, absent a showing of greater convenience or special circumstances that favor the second action, in order to avoid duplicative litigation." *In re Telluride Glob. Dev., LLC*, 380 B.R. 585, 593 (B.A.P. 10th Cir. 2007) (citation omitted).

Under the rule against claim splitting, a plaintiff must "assert all of its causes of action arising from a common set of facts in one lawsuit." *Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833, 841 (11th Cir. 2017) (quoting *Katz v. Gerardi*, 655 F.3d 1212, 1217 (10th Cir. 2011)). A plaintiff may not maintain "two separate actions involving the same subject matter, at the same

6

time, in the same court, against the same defendant." *Rumbough v. Comenity Capital Bank*, 748 F. App'x 253, 255 (11th Cir. 2018). The test for claim splitting is "(1) whether the case involves the same parties and their privies, and (2) whether separate cases arise from the same transaction or series of transactions." *Id.* (citation and quotation marks omitted). While claim splitting is analyzed "as an aspect of res judicata or claim preclusion," 857 F.3d at 841, it does not require finality of judgment in the first suit; rather, the rule applies when "the first suit, assuming it were final, would preclude the second suit." 748 F. App'x at 255 (citation and quotation marks omitted).

ENS argues that the Tennessee AP was filed before this proceeding, and both actions involve the same parties and the same series of transactions.[1] ENS further argues that Hale's State Law Claims are compulsory counterclaims in the Tennessee AP. Under Tennessee Rules of Civil Procedure, a counterclaim is compulsory "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction, except that a claim need not be stated as a counterclaim if at the time the action was commenced the claim was the subject of another pending action." Tenn. R. Civ. P. 13.01. "This rule is mandatory, and the failure to file such a counterclaim bars any subsequent lawsuit based upon that claim." *Quelette v. Whittemore*, 627 S.W.2d 681, 682 (Tenn. Ct. App. 1981) (citation omitted).

Hale argues that special circumstances favor this proceeding over the Tennessee AP. Hale's bankruptcy case is pending in this Court, ENS has filed a proof of claim and has participated in the bankruptcy case, hearing the issues before the same court that is also presiding

---

[1] Although this proceeding was filed a few hours before Hale filed the counterclaims in the Tennessee AP, Hale does not argue that this proceeding is the prior pending action. "[T]he filing of a counterclaim does not commence another civil action. Indeed, the counterclaim (or pleading in which it is alleged) is required to bear the caption and file number of the complaint. *Laddawn, Inc. v. Bolduc*, No. 17-CV-11044-TSH, 2018 WL 7047647, at *4 (D. Mass. Dec. 27, 2018); *see also* Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court.").

7

over the bankruptcy case would promote judicial economy and efficient administration of the bankruptcy estate, and the proposed recovery to Hale's creditors will be impacted by the outcome of these actions. Furthermore, both proceedings are at the same stage of litigation in that nothing substantive has yet occurred. Hale also suggests that the bankruptcy case itself is the prior pending action.

Here we have duplicative claims in two different adversary proceedings that are both pending in the same court under the umbrella of the same bankruptcy case. The Court agrees with ENS that the State Law Claims are compulsory counterclaims in the Tennessee AP, in that they involve the same parties and the same underlying transaction, which is the primary reason to favor the Tennessee AP and dismiss the State Law Claims from this proceeding. Dismissal of the State Law Claims from this proceeding is further supported by the fact that the remaining claims in the Tennessee AP and the State Law Claims can be resolved through the claims allowance process, which is generally a more streamlined process and thus, more efficient. Moreover, even if the State Law Claims are not compulsory counterclaims in the Tennessee AP, under the claim splitting doctrine, the State Law Claims cannot be asserted in both proceedings. As a result, it appears that the State Law Claims should be dismissed in accordance with the claim splitting doctrine. Alternatively, as set forth below, even if the Court were to retain the State Law Claims in this proceeding, they are subject to dismissal for failure to state a claim.

### B. Failure to State a Claim

ENS seeks to dismiss all counts in the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable by Federal Rule of Bankruptcy Procedure 7012(b). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient facts that, accepted as true, "state a claim to relief that is plausible on its face." *Bell*

*Atlantic Corporation v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 1940 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 664, 129 S. Ct. at 1940. When deciding a Rule 12(b)(6) motion, "the court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff." *Lubin v. Markowitz (In re Markowitz)*, AP No. 16–5221, 2017 WL 1088273, at *3 (Bankr. N.D. Ga. Mar. 22, 2017) (Ellis-Monro, J.) (citations omitted). "However, the Court is not required to accept as true legal conclusions couched as factual allegations or unwarranted deductions of fact." *Bank of Am. v. Seligman (In re Seligman)*, 478 B.R. 497, 501 (Bankr. N.D. Ga. 2012) (Ellis-Monro, J.) (citation omitted). The Court may disregard allegations that are conclusory and unsupported by facts to make the allegation plausible. *See Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (citing *Twombly*, 550 U.S. at 544, 127 S. Ct. at 1962-63); *see also Associated Ind. Ins. Co., Inc. v. Advanced Mgmt. Servs., Inc.*, No. 12-80393, 2013 WL 1149668, at *6 (S.D. Fla. March 19, 2013) ("The *Twombly* plausibility standard … does not prevent a plaintiff from pleading facts alleged upon information and belief where the belief is based on factual information that makes the inference of culpability plausible.") (cleaned up).

### 1. Counts 1-4: Avoidance, Recovery, and Preservation of Transfers

In Counts 1 and 2 of the amended complaint, Hale seeks to avoid as constructively fraudulent transfers the money he spent improving the Property. Under 11 U.S.C. § 548(a)(1)(B), the trustee, and by extension a debtor in possession,[2] can avoid

> any transfer ... of an interest of the debtor in property ... that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

---

[2] 11 U.S.C. § 1107(a).

9

> ...
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer
> ...; and
> (ii)(I) was insolvent on the date that such transfer was made ... or became insolvent as a result of such transfer or obligation[.]

11 U.S.C. § 548(a)(1)(B). Section 544(b) allows the trustee to avoid such transfers under analogous state law, providing for avoidance of certain transfers that are "voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502[.]" 11 U.S.C. § 544(b). Here, the applicable law Hale invokes is O.C.G.A. § 18-2-75(a) and Tenn. Code § 66-3-306(a), which provide:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

O.C.G.A. § 18-2-75(a). Tennessee Code § 66-3-306(a) is substantially the same except that it uses the term "fraudulent" where the Georgia Code uses "voidable." Both State Codes require the existence of a creditor whose claim arose before the transfer and provide a reach back period of four years, O.C.G.A. § 18-2-79(2); Tenn. Code § 66-3-310(2). Otherwise, the analysis for avoidance of constructively fraudulent transfers is essentially the same under state law and the Bankruptcy Code. *Phoenix Corporate Recovery Services, LLC v. Astrachan* (*In re Beaulieu Grp., LLC*), AP No. 18-4027, 2021 WL 4469928, at *27 (Bankr. N.D. Ga. Sept. 29, 2021) (Ellis-Monro, J.). When a transfer is avoided under § 544 or § 548 it is preserved for the benefit of the estate, 11 U.S.C. § 551, and the trustee may recover the property transferred or its value from the initial transferee or subsequent transferees, with some limitations. *Id.* § 550(a).

Thus, to state a claim, Hale must allege facts showing (1) a transfer made by Hale during the applicable time period; (2) that Hale received less that reasonably equivalent value for

10

the transfer; and (3) that Hale was insolvent at the time of the transfer or became insolvent as the result of the transfer. For Count 1, Hale must also allege facts showing the existence of a creditor whose claim arose before the transfer.

The primary dispute between the parties is whether Hale has sufficiently alleged that transfers took place. The Bankruptcy Code defines a transfer in relevant part as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with-- (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). Both State Codes define a transfer substantially the same in the context of voidable or fraudulent transfers. *See* O.C.G.A. § 18-2-71(16); Tenn. Code § 66-3-302(12).

ENS argues that Hale's improvements to the Property do not constitute transfers because whatever rights Hale had in the Property expired by operation of the Contract when Hale defaulted under the terms of the Contract. The expiration or extinguishment of rights in property is not a transfer according to ENS. Hale argues that he is not trying to avoid the expiration of his rights in the Property or any payments he made pursuant to the Contract. Rather, the transfers he seeks to avoid are the cash transfers from his personal bank accounts and funds expended for improvements to the Property from ENS, who as title owner of the Property received the benefit of said transfers. ENS argues that any rights Hale had in the Property, including improvements made by Hale, were extinguished when Hale defaulted on the Contract.

ENS cites to *Matter of Wey*, 854 F.2d 196 (7th Cir. 1988), in support of its position that the payments do not constitute transfers. In *Wey*, the debtor entered into a contract to purchase a hotel. The contract required the debtor to make a 10% downpayment, which would be forfeited if the debtor failed to close. The debtor did not close and was subsequently placed into an involuntary bankruptcy. The trustee sought to recover the down payment as either a preference or

11

a fraudulent transfer, arguing that by breaching the contract, the debtor effectively transferred the down payment to the seller. The Circuit Court disagreed, ruling that "what actually occurred when [the debtor] defaulted was an extinguishment of his equity interest in the hotel, not a transfer." *Id.* at 199.

Hale argues that *Wey* is distinguishable because the trustee was seeking to recover a payment made under the contract, while Hale is not seeking to avoid any contractual payments. The Court disagrees. Applying the logic of *Wey*, Hale had an equitable interest in the Property under the Contract. When Hale paid for improvements to the Property, those improvements benefited his equitable interest.[3] When Hale defaulted on the Contract, his equitable interest was extinguished.

Hale also argues that the Court should look to the overarching transaction and the ultimate recipient of the benefit, citing 2 Collier on Bankruptcy ¶ 101.54 (16th ed. 2026). Collier discusses the Supreme Court's decision in *Merit Management Group., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 138 S. Ct. 883 (2018), in which the Court considered whether an allegedly fraudulent transfer was exempted from avoidance by the trustee under 11 U.S.C. § 546(e), which protects certain transfers made to or for the benefit of certain financial institutions. In that case, the debtor had purchased a competitor's stock from a shareholder. One bank financed the purchase and a second bank held the funds in escrow and disbursed them. The trustee sought to avoid the transfer. The shareholder argued that § 546 applied because the funds for the transaction passed through two banks. The Court disagreed, holding that "the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid" rather than the component parts of the transfers to and from the banks. *Id.* at 378, 138 S. Ct. at 893.

---

[3] Furthermore, Hale alleges that his improvements resulted in increased rents, and the Court can reasonably infer that Hale benefited from the increased rents prior to reversion of the Property to ENS.

The Court noted the importance of the transfer the trustee sought to avoid. In *Merit*, the trustee was seeking to avoid the sale of stock from the shareholder to the debtor, not any transfers to or from the banks. *Id.* at 382, 138 S. Ct. at 895.

> After a trustee files an avoidance action identifying the transfer it seeks to set aside, a defendant in that action is free to argue that the trustee failed to properly identify an avoidable transfer under the Code, including any available arguments concerning the role of component parts of the transfer. If a trustee properly identifies an avoidable transfer, however, the court has no reason to examine the relevance of component parts when considering a limit to the avoiding power, where that limit is defined by reference to an otherwise avoidable transfer, as is the case with § 546(e)[.]

*Id.* at 382, 138 S. Ct. at 894-95.

Here, the transfers identified by Hale are not transfers of funds from Hale to ENS. Instead, they are transfers of funds from Hale to unspecified third parties, whose goods and/or services were used by Hale to improve the Property. [Doc. 5 ¶ 26 & Ex. C]. Unlike in *Merit*, there are no middlemen or conduits here who were only involved to facilitate a transaction between Hale and ENS. Instead, there were discrete transactions between Hale and vendors/tradespeople to improve the Property for *Hale's* benefit. Hale is not seeking to avoid those individual transfers. Based on the foregoing, Hale has not identified a transfer to ENS that can be avoided. Therefore, Counts 1 and 2 of the amended complaint will be dismissed.

In Counts 3 and 4, Hale asserts claims for preservation of an avoided transfer under § 551 and for recovery of an avoided transfer under § 550(a). Both statutes apply to a transfer that has been avoided under § 544, § 548 or other specified provisions. Section 550(a) provides that

> to the extent that a transfer is avoided under section 544 ... [or] 548 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]

11 U.S.C. § 550(a)(1). Section 551 provides that "[a]ny transfer avoided under section … 544 … [or] 548 ... of this title … is preserved for the benefit of the estate but only with respect to property of the estate." Because Hale has failed to state a claim for avoidance of a transfer under § 544 or § 548, he likewise fails to state a claim under § 550(a) and § 551, and Counts 3 and 4 of the amended complaint will be dismissed.

### 2. Counts 5-7: Unjust Enrichment, Quantum Meruit, and Attorney Fees

In Counts 5 and 6, Hale asserts claims for unjust enrichment and quantum meruit, both of which are quasi contract claims. "Under an unjust enrichment theory, courts impose a contractual obligation where there is 'no contract between the parties or the contract has become unenforceable or invalid,' and the defendant will be unjustly enriched unless the court imposes a quasi-contractual obligation." *Fam. Tr. Servs. LLC v. Green Wise Homes LLC*, 693 S.W.3d 284, 304 (Tenn. 2024) (quoting *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998). To state a claim for unjust enrichment, Hale must allege: (1) a benefit conferred on ENS by Hale; (2) appreciation by ENS of the benefit; and (3) "acceptance of such benefit under such circumstances that it would be inequitable for [ENS] to retain the benefit without payment of the value thereof." 693 S.W.3d at 304 (citation omitted). "The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005).

A claim for quantum meruit is similar, but is subject to a five-part test as follows:

(1) There is no existing, enforceable contract between the parties covering the same subject matter;
(2) The party seeking recovery proves that it provided valuable goods or services;
(3) The party to be charged received the goods or services;
(4) The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and

14

(5) The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

*Doe v. HCA Health Servs. of Tennessee, Inc.*, 46 S.W.3d 191, 197-98 (Tenn. 2001).

In the amended complaint, Hale alleges that he had a reasonable expectation of retaining the benefit of his work to improve the Property and that ENS was aware or should have been aware that Hale conferred a benefit upon ENS with the expectation of receiving title to the Property. ENS argues that under the Contract, Hale is required to maintain the Property. Additionally, upon Hale's default, the Contract is voided, the Property reverts to ENS, ENS has no further obligation to Hale, and Hale will not be refunded any money paid to ENS. The Contract also contains an integration clause that provides the Contract represents the entire agreement of the parties, and no modifications are effective unless in writing. Except for payment terms, the Amendment did not change any rights under the Contract, including the integration clause, and was executed after Hale discovered any deficiencies in the condition of the Property and expended funds to improve the Property. Because ENS's obligations to Hale terminated and because nothing in the Contract or Amendment required ENS to reimburse Hale for repairs, Hale cannot sustain a claim for unjust enrichment or quantum meruit.

Hale argues that the Contract does not govern the subject matter at issue because it does not address improvements to the Property after the Contract was executed. Neither the Contract nor the Amendment addressed the parties' respective rights relating to any improvements to the Property outside of regular maintenance in at least the condition it was in at the time of signing the Contract. ENS counters that the expectation based on the terms of the Contract is that upon a default by Hale, ENS would owe nothing to Hale and the Property would revert to ENS free of any obligations to Hale.

The Contract includes the following relevant provisions:

15

> Maintenance of the Property including but not limited to the roof, exterior walls, interior walls and fixtures, HVAC system, electrical wiring, and plumbing system of the Building shall be the responsibility of the Buyer. The Buyer agrees to maintain the building in a condition comparable to the condition at the time of signing this contract.
>
> ...
>
> Should the Buyer fail to meet the terms and conditions of this agreement, the property will revert entirely to the Seller with the Seller having no further obligations or duties to Buyer.
>
> ...
>
> The entire understanding between the parties is set out in this Land Sales Contract, this Agreement supersedes and voids all prior proposals, letters and agreements, oral or written, and no modification or alteration of this Agreement shall be effective unless evidenced by an instrument in writing signed by both parties.

[Doc. 5, Ex. A ¶¶ 5a, 8, 12]. The Amendment delayed calling of the loan and increased the balloon payment but did "not change or take away any rights or requirements of any party created in the original contract and all other aspects of existing contract remain." [Id. Ex. B].

Hale cites *Smith v. Hi-Speed, Inc.*, 536 S.W.3d 458 (Tenn. Ct. App. 2016), and *Durnelco, Inc. v. Double James, L.L.C.*, No. E2001-02010-COA-R3CV, 2002 WL 1379571 (Tenn. Ct. App. June 26, 2002), as examples of cases where unjust enrichment and quantum meruit claims in landlord-tenant disputes could not stand because the subject matter was governed by a contract. Hale contends these cases can be distinguished from this proceeding, because the contracts in *Smith* and *Durnelco* had specific remedies that governed the making and/or removal of improvements in the leased property.

In *Smith*, the lease provided that the landlord would build the leased premises to suit the operations of the tenant. To pay for the build, the landlord financed a construction loan secured by a second property. The lease provided for base rent of $14,000 per month and "Additional Rent" of $4,000 to cover the landlord's financing costs so long as the second property was collateral for the construction loan. The landlord argued that the parties had an additional oral agreement that the landlord would sell the second property and contribute the proceeds to the

16

construction of the leased property, and that the tenant would continue to pay the additional $4,000 per month for 20 years. The landlord subsequently sold the second property such that it no longer served as collateral for the construction loan. The tenant continued making the additional rent payments until new owners of the tenant ordered that the payments stop. The landlord then sued over the failure to make the additional payments, asserting claims for unjust enrichment and quantum meruit, among other things. 536 S.W.3d at 462-466.

The court rejected the unjust enrichment and quantum meruit claims because "an enforceable contract already exists regarding the same subject matter." *Id.* at 480. The landlord argued that the subject matter was not the same because the "Additional Rent" provision in the lease did not address the sale of the second property. *Id.* at 481. The court explained that "[t]he written lease agreement generally addresses, inter alia, the consideration that is to be provided in exchange for financing the construction of the [leased property]. The fact that it does not cover every element of consideration allegedly agreed to as part of a purported larger agreement does not mean that it does not cover the same subject matter." *Id.*

In *Durnelco*, the tenant renovated the leased property at its own expense. After the lease was terminated, the tenant filed suit to recover possession of the improvements it made to the property (including things like flooring and a deck) under a theory of unjust enrichment. 2002 WL 1379571, at *1-2. The lease allowed the tenant to make alterations to the property at its expense and provided that "Tenant shall have the right to remove any alteration or addition made by it at the termination of this Lease so long as the removal does not [a]ffect the structural element of the Demised Premises." *Id.* at *3. The court rejected the tenant's unjust enrichment claim on the basis that "the lease is a written contract covering the subject matter at issue" and without further analysis. *Id.* at *7.

17

The Court agrees with ENS that Hale has failed to state a claim for unjust enrichment or quantum meruit because, here, there is a contract between the parties that covers the subject matter of the claims—the ownership of the Property. This case is distinguishable from *Smith* and *Durnelco* because it involves a contract for the sale of property rather than a lease. The fact that the Contract does not expressly address improvements made by Hale does not mean that said improvements are somehow beyond the scope of the Contract. The Contract provides for the conveyance of the Property to Hale upon full payment. But upon default the Property "will revert *entirely*" to ENS. [Doc. 5, Ex. A ¶ 8 (emphasis added)]. As in *Smith*, the fact that the Contract does not address every potential alteration or improvement to the Property made by Hale does not mean that such improvements are outside the scope of the Contract. Therefore, Counts 5 and 6 will be dismissed.

In Count 7, Hale seeks attorney fees under O.C.G.A. § 13-6-11, which allows a plaintiff to recover expenses of litigation if "the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." *Id.* Because Hale has otherwise failed to state a claim, he is not entitled to recover attorney fees. Therefore, Count 7 will be dismissed.

For the reasons stated herein, it is

ORDERED that the Motion to Dismiss is GRANTED and all claims in the amended complaint are DISMISSED.

**END OF ORDER**

**Distribution List**

Caitlyn Powers
Rountree Leitman Klein & Geer, LLC
Century Plaza I, Suite 350
2987 Clairmont Road
Atlanta, GA 30329

William A. Rountree
Rountree Leitman Klein & Geer, LLC
Century Plaza I, Suite 350
2987 Clairmont Road
Atlanta, GA 30329

Larry Carson Hale, Jr.
170 Cline Smith Road, NE
Cartersville, GA 30121

Leslie M. Pineyro
Jones and Walden, LLC
699 Piedmont Avenue NE
Atlanta, GA 30308